806                      62 Mass. App. Ct. 806 (2005)

Foreign Car Center, Inc. *v.* Essex Process Service, Inc. (No. 1).

FOREIGN CAR CENTER, INC. *vs.* ESSEX PROCESS SERVICE, INC.,
& others (No. 1).[1]

No. 03-P-667.

Essex. May 7, 2004. - January 26, 2005.

Present: KANTROWITZ, DREBEN, & SMITH, JJ.

*Trespass. Conversion. Damages,* Conversion. *Joint Tortfeasors. Negligence,*
Joint tortfeasor. *Practice, Civil,* Instructions to jury. *Massachusetts Civil
Rights Act. Civil Rights,* Availability of remedy. *Consumer Protection Act,*
Trade or commerce.

This court adopted the view of Restatement (Second) of Torts § 214(2)
(1965) as to the measure of damages for the tort of trespass ab initio, or
conversion: specifically, that a sheriff who makes an entry to execute
process pursuant to a valid writ and thereafter commits an act which is tor-
tious is subject to liability only for such tortious act and does not become
liable for his original lawful entry; thus, at the trial of a complaint arising
out of the defendants' seizure and sale of motor vehicles to satisfy a judg-
ment held by the defendant creditor against the plaintiff car dealership, in
which the jury could have found, based on the evidence, that the defendant
sheriff, after making a lawful entry onto the plaintiff's place of business to
execute process, thereafter made a technical error in his return of service
on the writ or in his sale of the seized vehicles, there was no error in the
judge's charge to the jury, which instructed that the plaintiff was not
entitled to the market value of the property seized, but rather was required
to show some special damage that occurred as a result of the sheriff's
technical deficiency. [811-813]

At the trial of a complaint arising out of the seizure and sale of motor vehicles
to satisfy a judgment held by the defendant creditor against the plaintiff
car dealership, it would have been incorrect for the judge to instruct the
jury that a finding of conversion on the part of the defendant process
service company and its employee, a deputy sheriff, would necessarily
require a similar finding with regard to the creditor, where the tortious
conduct at issue was strictly the responsibility of the sheriff; moreover,
such an instruction would also have been improper with regard to the
defendant towing company, which had no knowledge, or any reason to
know, that the process service company or its employee was converting the
plaintiff's property. [813-814]

At the trial of a complaint arising out of the seizure and sale of motor vehicles
to satisfy a judgment held by a creditor against the plaintiff car dealership,

[1]Gaeta Towing Services, Inc., Warren Five Cents Savings Bank, and George
Curran.

the judge properly allowed directed verdicts in favor of the defendants, a process service company and its employee, on the plaintiff's civil rights claim, where the defendants had valid writs issued by a court and were entitled even to use force if deterred in their duties under the court orders. [814]

A trial court judge did not err in granting summary judgment to the defendants on a claim alleging violations of G. L. c. 93A, where there was no conduct of trade or commerce between the defendants and the plaintiff. [814-815]

CIVIL ACTION commenced in the Superior Court Department on May 23, 1994.

Motions for summary judgment were heard by *Richard E. Welch III*, J., and the case was tried before *Allan van Gestel*, J.

*George E. Richardson* for the plaintiff.

*Thomas E. Peisch* (*Maria E. DeLuzio* with him) for Essex Process Service, Inc., & another.

*John L. Dodge* for Gaeta Towing Services, Inc.

*Matthew W. Perkins* for Warren Five Cents Savings Bank.

DREBEN, J. Foreign Car Center, Inc. (Foreign Car), a corporation engaged in the selling, leasing and repairing of motor vehicles, was in difficult financial circumstances in the early 1990's. Its president and treasurer, Stefano Picciotto (Picciotto), was sick due to toxic fumes from a neighboring factory and could only work a few hours at a time. His wife, Judith Picciotto (Judith), the sole stockholder of Foreign Car, testified that both were "very ill" and "were trying to run [Foreign Car] on a bit of a string."

A creditor of Foreign Car, Warren Five Cents Savings Bank (bank), recovered a judgment against it of $16,000 in November, 1993. Pending Foreign Car's appeal, the bank obtained an ex parte writ of attachment and, after the appeal was dismissed, a writ of execution. Pursuant to the writs, fifteen vehicles of Foreign Car were seized and eventually sold. This action naming multiple defendants and alleging multiple claims arose out of the seizure and sale of those vehicles.[2] Foreign Car was

---

[2]Although additional claims were asserted prior to judgment, the issues remaining for decision in this appeal involve conversion against all four

awarded damages by a jury, but on appeal it claims that it was deprived of an adequate award and of its valid claims because of errors by both the motion judge and the trial judge.

More particularly, Foreign Car urges that the trial judge made numerous errors with respect to its claims of conversion asserted against the four defendants in this action: the bank; Essex Process Service, Inc. (Essex), a for-profit corporation organized to serve civil process; Essex's employee, George Curran, a deputy sheriff who seized the vehicles; and Gaeta Towing Services, Inc. (Gaeta), the company Essex had engaged to tow the vehicles. Foreign Car also claims, inter alia, that the trial judge erroneously directed a verdict in favor of Essex and Curran on its civil rights claim, and that the motion judge erroneously granted summary judgment to Essex on its G. L. c. 93A claim.

1. *Background.* We describe the facts as could have been found by the jury except as to the plaintiff's civil rights claim; for that claim, on which the judge granted a directed verdict in favor of Essex and Curran, we state the facts in the light most favorable to the plaintiff.

On February 18, 1994, after the bank had obtained a writ of attachment for $20,000, Curran, acting pursuant to the writ, went to Foreign Car's place of business in Peabody. Not finding Picciotto there, Curran began seizing vehicles and instructed Gaeta to tow them away. Alerted by a neighbor, Picciotto came to the premises and was shown the writ.

Picciotto asked Curran to return the cars immediately. He complained that Curran was taking customers' cars not owned by Foreign Car, that Gaeta was towing vehicles over snowbanks in a rough and damaging manner, and that Essex and Gaeta were taking away vehicles whose value was substantially in

---

defendants; abuse of process against Essex Process Service, Inc. (Essex), and George Curran; violation of civil rights against Essex and Curran; and violation of G. L. c. 93A against Essex.

Since some of claims made by Foreign Car raise no substantial issues of law meriting publication, we have addressed them in a memorandum and order pursuant to our rule 1:28. *Foreign Car Center, Inc.* v. *Essex Process Serv., Inc. (No. 2), post* 1120 (2005). See *Commonwealth* v. *Russo,* 49 Mass. App. Ct. 579, 586 n.15 (2000).

excess of $20,000.[3] Seven of Foreign Car's vehicles were taken in February. In the course of Picciotto's attempts to stop Curran, the latter pointed a four by four piece of wood toward Picciotto in a "very menacing" manner. Picciotto felt intimidated and was in fear for his life. Later, when Picciotto's wife, Judith, came to the premises and objected to the removal of the cars, Curran patted his gun and said to her, "I don't want to hear from you anymore." Judith felt frightened.

Picciotto called the Peabody police. A police officer came and, after looking at the writ, told Picciotto that the matter was civil and that no police action could be taken at that time. Picciotto did not tell the police officer that he had been threatened by Curran.

The writ of attachment was never returned to court. Curran testified he did not know what happened to the original writ.[4]

On May 2, 1994, Curran returned to Foreign Car's place of business. This time he was armed with a writ of execution in the amount of $21,409.44 and with instructions from the bank's attorney to make a demand for payment. Picciotto was not there. A man named Paul Stunzi, who sublet the premises and operated a similar business, identified himself as Picciotto's partner and said he was in charge. Curran served Stunzi with the writ. Later, when Picciotto arrived, Curran also served Picciotto with the writ and again made a demand for payment.

On that day, Curran took an additional eight cars. He testified that he relied on the bank, both in February and in May, to determine how many cars to take. The bank's attorney thought otherwise and testified that he directed Essex and Curran to seize the number of cars that would satisfy the writs. The value of the cars taken was also in dispute. Picciotto claimed that the fifteen cars had a value of $67,000.[5] Curran stated that they ap-

---

[3]On February 18, 1994, and on May 2, 1994, Curran seized a total of six cars not belonging to Foreign Car. The claims relating to those cars are not involved in this appeal.

[4]The parties stipulated that the writ of attachment was affixed to the police report given to Foreign Car's counsel. It is not clear from the record whether the police had the original writ or a copy.

[5]Picciotto stated that the cars, which ranged in age from seven to twenty-four years, had been reconditioned, but admitted that after the commencement

peared to be a "bunch of junks"; Gaeta thought the cars were "in disrepair" and that Foreign Car's lot was a "junkyard."

Because of Picciotto's insistence that some of the vehicles were owned by customers and not by Foreign Car, Curran sought certificates of title as proof of ownership prior to selling the cars at a sheriff's sale. When Picciotto refused to cooperate, the bank's attorney obtained a court order requiring Picciotto to deliver the certificates. The delay in obtaining them caused postponement of the sales, and none occurred within thirty days of levy as required.[6] See G. L. c. 235, § 38. At the first sale, Picciotto requested that the engines be started before the bidding began, but Curran refused. The total proceeds of the sales were $4,620.

The net expenses to the bank of the levy by execution, including towing and storage, were $18,280 as determined in the underlying action between the bank and Foreign Car. After the three sales, judgment in that action entered for the bank in the amount of $39,689 plus interest. That judgment was affirmed by this court. *Warren Five Cents Sav. Bank* v. *Foreign Car Center, Inc.*, 50 Mass. App. Ct. 1112 (2001).

Foreign Car's claims of negligence, conversion and trespass, relating to the seizures of February 18, 1994, and May 2, 1994, were submitted to the jury on special questions. After an eight day trial, the jury found that Essex and Curran converted Foreign Car's property on February 18, 1994, resulting in damages of $300, and again on May 2, 1994, with damages of $500. The jury also found that Essex and Curran were negligent with respect to the February 18, 1994 seizure resulting in damages of $507.50, and had committed a trespass with damages of $4,921.25. As to the May 2, 1994 seizure, the jury found Essex and Curran had committed a trespass resulting in damages of $2,881.25. Gaeta was also found negligent on May 2, 1994, resulting in damages of $410.

---

of this litigation he threw away or destroyed all records pertaining to the reconditioning. He acknowledged that all of the vehicles had been out in the open on the premises for at least a year prior to February, 1994, and that Foreign Car had been unable to sell them. He further testified that the vehicles had been damaged by vandalism and exposure to toxic substances.

[6]Thirteen cars were sold on June 24, 1994; one on January 26, 1995; and one on March 23, 1995.

62 Mass. App. Ct. 806 (2005)      811

Foreign Car Center, Inc. *v.* Essex Process Service, Inc. (No. 1).

2. *Conversion.* a. *Damages.* Foreign Car claims error in the judge's charge, which distinguished between two kinds of conversion and instructed that each had a different measure of damages.[7] The judge explained that the first occurs if there is no right to take the property at all,[8] or if the amount that is taken exceeds in value the amount authorized by the writ. The second is "a conversion in . . . a technical sense. . . . The technical sense being the seizure was appropriate, taking the vehicles and storing them was appropriate, but something thereafter happened that technically didn't comply . . . with the law." The judge gave examples of what he called technical deficiencies that the jury could find based on the evidence, which included the following: the sheriff may have failed to put a return of service on the back of the writ of attachment and may have failed to file it in court; and the sale should have taken place within thirty days but did not, and there was not a proper postponement. For the first type of conversion, "the party whose property is converted is entitled to the reasonable market value of the property converted. But when you have a conversion or a trespass, such as may have occurred here, [because of] technical deficiencies by the sheriff, the party isn't entitled to a fair market value. The party has to show some special damage that occurred . . . as a result of the deficiency."

Foreign Car urges that there is only one measure of damages for conversion or trespass ab initio: the market value of the property at the time of the seizure plus interest. Such damages, it claims, are to be awarded even for those matters that the judge called technical.[9]

Relying on old cases such as *Wiggin* v. *Atkins*, 136 Mass. 292, 293 (1884), Foreign Car claims that the failure to return

---

[7] Our description of the judge's charge is taken both from his initial instructions and from those in response to a question from the jury.

[8] The judge indicated that this was not the case as the parties had stipulated that there was a valid writ of attachment and a valid execution.

[9] On appeal Foreign Car points to the following acts or failures to act that the judge considered technical deficiencies and that should have been subject to the ordinary measure of damages for conversion — the fair market value of the property converted: (1) the failure of Curran and Essex to make a return to the court of the writ of attachment for the seven vehicles seized on February 18, 1994; (2) the failure of Essex and Curran to sell the fifteen cars within thirty days after the purported levy of the execution as required by G. L.

the writ of attachment constitutes either conversion or trespass ab initio, entitling Foreign Car to damages equal to the market value of the property. See *Pierce* v. *Benjamin*, 14 Pick. 356, 360 (1833); *Shapira* v. *Walker*, 225 Mass. 451, 453 (1917).

While older cases support the position of Foreign Car, more recent cases, although stressing that the sheriff must "turn square corners," suggest that where minor errors occur, the plaintiff has to show some damage. *Bertonazzi* v. *Mechanics Natl. Bank*, 379 Mass. 920, 921 (1980). See *MRI, Inc.* v. *J. Henry Schroeder Bank & Trust Co.*, 12 Mass. App. Ct. 903 (1981).

The Restatement (Second) of Torts § 214(2) (1965) takes the position that a sheriff who makes an entry to execute process pursuant to a valid writ and "thereafter commits an act which is tortious, is subject to liability only for such tortious act, and does not become liable for his original lawful entry." See *id.* § 278. See also *id.* §§ 208, 266. Comment e to § 214 explains:

> "Trespass ab initio [which also applies to seizure of chattels, see § 278] was a peculiar and anomalous fiction developed by the early common law, by which one who entered properly upon land in the exercise of a privilege conferred by authority of law, and subsequently abused the privilege by conduct which was itself a trespass to person, land, or chattels, became liable not only for the later misconduct, but also for the original lawful entry. The abuse of the privilege was related back to forfeit it entirely, and the actor became a trespasser 'ab initio,' or from the beginning.
>
> "This fiction had its origin . . . in a time of strict rules of pleading, where much subsequent misconduct was not actionable in itself, and it served to afford a remedy where none was otherwise available. . . . The doctrine has long been denounced by legal writers as a senseless fiction."

c. 235, §§ 36 and 38; and (3) the failure of Essex and Curran to make service or a demand for payment prior to the seizures.

Foreign Car also urges that Essex and Curran seized property in excess of the value authorized, but as to this claim, it does not challenge the instruction as to damages.

The judge's instructions, although using different terminology, were in accord with the measure of damages in § 214 of the Restatement. That measure is also endorsed by leading commentators, see Prosser & Keeton, Torts § 25, at 150-152 (5th ed. 1984); 1 Harper, James & Gray, Torts § 1.21, at 81-84 (3d ed. 1996), and has been followed in more recent cases. Thus, the doctrine of trespass ab initio has been rejected, primarily in false imprisonment cases where there has been a valid arrest. See *Dragna* v. *White*, 45 Cal. 2d 469, 473 (1955); *Anderson* v. *Foster*, 73 Idaho 340, 348 (1953); *Shaw* v. *Courtney*, 317 Ill. App. 422, 426 (1943); *Stromberg* v. *Hansen*, 177 Minn. 307, 309 (1929); *Cline* v. *Tait*, 113 Mont. 475, 483-484 (1942); *Brown* v. *Meier & Frank Co.*, 160 Or. 608, 617-618 (1939). See also *Gerrity Oil & Gas Corp.* v. *Magness*, 946 P.2d 913, 927 (Colo. 1997); *Robinson* v. *Dean Witter Reynolds, Inc.*, 129 F.R.D. 15, 20 (D. Mass. 1989).

The doctrine has also been repudiated in England, where it originated. See *Six Carpenter's Case*, 77 Eng. Rep. 695 (K.B. 1610). In *Chic Fashions (West Wales) Ltd.* v. *Jones*, 1 All E.R. 229, 236 (Q.B. 1968), a case involving chattel, Lord Denning referred to trespass ab initio as "a by-product of the old forms of action. Now that they are buried, it can be interred with their bones." Prosser is in agreement, stating: "there is good reason to expect that the entire doctrine is on its way to oblivion." Prosser & Keeton, Torts § 25, at 152 (5th ed. 1984). We are persuaded that the Restatement view as to damages is the appropriate one, and that the judge's instructions as to damages were, therefore, correct.

b. *Claim of conversion against the bank and Gaeta.* Foreign Car also contends that it was error for the judge not to instruct the jury that if they should find Curran and Essex liable for conversion, then the bank and Gaeta were liable as well under the principle of joint and several liability. "All parties engaged in committing a conversion of the goods of another may be held jointly or severally for the wrong." *Refrigeration Discount Corp.* v. *Catino*, 330 Mass. 230, 235 (1953). The jury, however, could not have found conversion or other tortious conduct by the bank with regard to the so-called "technical" violations committed by Essex and Curran, as these were strictly the

responsibility of the sheriff.[10] It would, therefore, have been incorrect to instruct the jury that a finding of conversion on the part of Essex and Curran would necessarily require a similar finding with regard to the bank.

Such an instruction would also have been improper with regard to Gaeta. A bailee or agent who receives chattels for storage or transport on behalf of his bailor is not subject to liability for conversion if he had no knowledge that his bailor is not the true owner. *Gurley* v. *Armstead,* 148 Mass. 267, 268 (1889). Restatement (Second) of Torts § 230 (1965). Prosser & Keeton, Torts § 15, at 95 (5th ed. 1984). Foreign Car presented no evidence, nor does it argue, that Gaeta had any knowledge or reason to know that Essex or Curran was converting Foreign Car's property.

3. *Civil rights claim.* The trial judge allowed directed verdicts in favor of Essex and Curran on Foreign Car's civil rights claim — the right "to enjoy . . . [its] personal property." To establish a civil rights claim, Foreign Car had to prove that (1) its exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion. *Sarvis* v. *Boston Safe Deposit & Trust Co.,* 47 Mass. App. Ct. 86, 91 (1999).

The difficulty with Foreign Car's claim is that it had no right to interfere with Curran's actions. Curran had valid writs issued by a court and was entitled even to use force if he was deterred in his duties under the court orders. See *Platt* v. *Brown,* 16 Pick. 553, 556 (1835). Foreign Car had no right to stop Curran, and if aggrieved, it was relegated to its ability to seek relief in court.[11] See *Huntington* v. *Winchell,* 8 Conn. 45 (1830). There was no error.

4. *Chapter 93A claim against Essex and Curran.* Foreign

---

[10]The bank could have been found liable if the jury determined that the number of vehicles taken was in excess of the amount of the writ and that the bank had told Curran how many vehicles to take. The jury, however, were not required to make either finding.

[11]The Picciottos may individually have an assault claim, but Foreign Car has no civil rights claim.

Car's G. L. c. 93A claim against Essex and Curran is disposed of by *Cady* v. *Marcella*, 49 Mass. App. Ct. 334, 343 (2000), holding there was no conduct of trade or commerce between the plaintiffs and the deputy sheriff who seized the property. Accordingly, the motion judge did not err in granting summary judgment on the claim.

The remaining claims of Foreign Car are treated in a memorandum and order pursuant to our rule 1:28. See note 2, *supra*.

*Judgment affirmed.*